IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


JIMMIE BUTLER,

                              Plaintiff,                    Case No. 3:08 CV 162

              -vs-
                                                           MEMORANDUM   OPINION

COOPER-STANDARD
AUTOMOTIVE INC., et al.,

                              Defendant.

KATZ, J.

        This matter is before the Court on three motions.  The first is Defendants Cooper-Standard

Automotive, Inc. ("Cooper") and Timothy Barnhisel's ("Barnhisel") motion to dismiss (Doc. 32),

which Plaintiff Jimmie Butler ("Butler" or "Plaintiff") opposes (Doc. 34).  The second is

Defendant Barnhisel's motion for summary judgment (Doc. 37).  The third is Defendant Cooper's

motion for summary judgment (Doc. 38).  Plaintiff filed a response in opposition to Defendants'

motions for summary judgment (Doc. 47), Defendants Barnhisel and Cooper filed a reply (Doc.

52), Plaintiff filed an additional memorandum in opposition (Doc. 58), and Defendants responded

to the additional memorandum (Doc. 59).  This Court has jurisdiction pursuant to 28 U.S.C. §

1331.

        For the reasons stated below, Defendants Cooper and Barnhisel's motion to dismiss (Doc.

32) shall be denied.  Defendant Barnhisel's motion for summary judgment (Doc. 37) shall be

granted.  Defendant Cooper's motion for summary judgment (Doc. 38) shall be granted.

**I. Background**

        **A. Plaintiff's work record**

Plaintiff Butler was an employee at Cooper's Bowling Green, Ohio hose plant from June 19, 1996, to September 17, 2007.  He was represented by United Steel Workers of America, Local 1152L ("Union").  Plaintiff spent his entire career at Cooper as a Mandrel Operator.  As a Mandrel Operator, Plaintiff worked in a "pool" paired with at least one other operator.  (*See* Doc. 38 at Ex. 1.).  Plaintiff's main job duties were to place preformed pieces of rubber hose on metal bars, slide those bars into an autoclave (a large oven) to cure, and then remove the hoses from the bars at the completion of the cure cycle.  (*Id.*).  Plaintiff was also required to perform "miscellaneous" duties. (*Id.*).

During his employment, Plaintiff was involved in several incidents that each resulted in a meeting with Cooper, Plaintiff, and the Union to discuss Plaintiff's performance or behavior. (Doc. 38 at Ex. 3.).  For example, on April 4, 1997, May 14, 1998, June 16, 2000, August 19, 2004, October 20, 2004, and October 3, 2006, Cooper met with Plaintiff and the Union about disagreements between Plaintiff and his supervisors.  (*Id.*).  This includes reports that state: Plaintiff "is close to crossing over into insubordination" (5/14/1998); there was "an incident between J. Butler and his supervisor . . . regarding insubordination" (6/16/2000); Plaintiff was warned to stop "disrespect of [his] supervisor's name" (8/19/04).  (*Id.*).  On June 10, 1998, October 21, 2004, June 10, 2006, January 31, 2007, March 9, 2007, May 31, 2007, and August 22, 2007, Cooper met with Plaintiff and the Union regarding Plaintiff's attitude, behavior problems, or failure to follow company policy.  (*Id.*).  This includes reports that state: Plaintiff had a "disgruntled attitude" (6/10/1998); Plaintiff was "viewing [television] in the workplace" (10/21/04); and Plaintiff violated the hearing/eye wear policy (6/10/06).  (*Id.*).  However, throughout his career, Plaintiff's evaluations also included some good comments from Cooper.

2

(Doc. 47 at Ex. A.).  This includes evaluations that state: Plaintiff "improved considerably" (6/23/99); Plaintiff "is a hard worker" (1/16/03); and Plaintiff has "improved his attitude dramatically" (11/12/98).  (*Id.*).

### B. Supervisor Timothy Barnhisel

Butler, who is black, believes that Cooper discharged him as a result of unlawful discrimination based on race.  Specifically, Butler argues that supervisor Timothy Barnhisel engaged in unlawful discrimination that went unchecked by Cooper and resulted in Butler's discharge.  Because Plaintiff usually worked the second shift and Barnhisel usually worked the first shift, Plaintiff encountered Barnhisel on occasions when Plaintiff worked overtime or the second shift supervisor was absent.  Plaintiff seeks to establish that Barnhisel has a history of racism.  In addition to incidents with Plaintiff, there are three incidents in which individuals other than Plaintiff felt unfairly treated by Barnhisel: (1) admonishment of Michael Brownlee; (2) threatening of Sean Walker; and (3) termination of Roy Williams.  These incidents are summarized below.

In 1999, before Barnhisel was a supervisor, Michael Brownlee, an African American who worked in a different department than Barnhisel, claims to have been admonished by Barnhisel. (Brownlee Dep. at 8-12; Butler Dep. at 70-71.).  Brownlee claims that when Barnhisel spotted him in the parts-washing area, a place where he was admittedly not permitted to be, Barnhisel impolitely asked what he was doing there and later hostilely approached him a second time. (Brownlee Dep. at 8-15.).  Brownlee states that Barnhisel did not admonish a white employee for being in this area.  (*Id.* at 47-48.).  However, according to Brownlee, employees may enter the parts-washing area with supervisor approval.  (*Id.* at 48.).  Brownlee could not confirm whether

3

the white employee who was not admonished was instructed by a supervisor to be in the parts-washing area.  (Brownlee Dep. at 48.).

In 2006, Barnhisel approached Sean Walker and Brownlee to confront Walker about violating the safety glasses rule.  (Sean Walker Dep. at 10.).  Walker admits that he was improperly wearing safety glasses in violation of a safety rule.  (*Id.* at 26-27.).  Barnhisel's body language was negative and confrontational.  (*Id.*).  When Brownlee threatened to complain to the Human Resources Department ("HR"), Barnhisel said something to the effect that the employees should not "play the race card again."  (*Id.* at 13-14; Brownlee Dep. at 21-23, 31.).  Barnhisel claims to have been walking away when Brownlee made a taunting comment that Barnhisel's hand was shaking.  (Doc. 47 at Ex. B pp. 33.).  Barnhisel asked Brownlee if Brownlee wanted to be sent home to which Brownlee responded "Go ahead and try it."  (*Id.*).  During this confrontation, Brownlee claims that Barnhisel threatened that he would do to Brownlee "like we did to Roy [Williams]."  (Brownlee Dep. at 21.).

Roy Williams was a black Cooper employee who Plaintiff believes was fired when he complained about Barnhisel's racist behavior.  (Doc. 47 at 17-18.).  Plaintiff argues that Cooper strayed from the company's usual process when Cooper discharged Williams.  Cooper uses "attendance points" as the disciplinary policy.  Cooper terminates employees with zero attendance points.   The policy states:

> [w]hen an employee reaches four (4) points, a meeting will be arranged between the employee and a designated Human Resource Representative. Documentation of this meeting will be issued upon its completion.
> When an employee reaches one (1) point, a meeting will be arranged between the employee and a designated Human Resource Representative. Documentation of this meeting will be issued upon its completion.

4

(Doc. 47 at Ex. E.).  Plaintiff believes Cooper failed to properly apply this policy on Williams in retaliation for Williams's complaints about racism.  However, Cooper has submitted a May 17, 2002 notification that warned Williams that he only had four points left and additional poor behavior could result in termination.  (Doc. 52 at Ex. 6.).  Subsequently, on August 12, 2002, Cooper gave Williams an August 9, 2002 notification that Williams had reached two points. (Doc. 52 at Ex. 7.).  On August 14, 2002, Williams was disciplined for leaving his pool with "overflowing baskets."  (Doc. 52 at Ex. 7.).  Two days later, on August 16, 2002, Williams complained about racial concerns.  (Doc. 52 at Ex. 6-8.).  In mid-September 2002, Williams was discharged for reaching zero attendance points.  (Doc. 47 at Ex. B pp. 18-22.).

### C. Charges of Discrimination

Plaintiff sent charges of discrimination to the United States Equal Employment Opportunity Commission ("EEOC") on the following dates: August 29, 2006, January 23, 2007, and November 20, 2007.  The EEOC responded with three right-to-sue letters.  The events leading to each of Plaintiff's complaints, as well as the allegedly retaliatory actions that followed, are detailed below.

#### 1. August 29, 2006 charge of discrimination

After first filing a complaint with Cooper's HR Department, Plaintiff filed a charge of discrimination with the EEOC stating that "[t]he supervisor harass[es] me ever[y] chance he gets[.] [O]n Aug 26[, 2006,][1] he got into my face and told me to shut the F... up and [h]e said he

---

[1]

 According to Cooper's internal report, the incident occurred on August 19, 2006.  (Doc. 47 at Ex. B pg 28.).

5

would find [a reason] to send me home.  First shift supervisor Tim [Barnhisel also did this] to other person[s] of my race."

Mark Dewulf,  Cooper's Business Manager, investigated the incident.  Barnhisel admitted to Dweulf that he told Plaintiff to shut up but not that he used a profanity.  (Doc. 47 at Ex. B pp. 28.).  Cooper employees Mike Mackey and Kelly Burrier stated that Barnhisel was in Plaintiff's personal space.  (*Id.*).  Cooper management brought Barnhisel and Plaintiff together for a meeting on August 22, 2006.  During this meeting, Barnhisel apologized to Plaintiff for saying "shut up" and explained that it was difficult to work with Plaintiff because Plaintiff failed to put tooling away, did not record asset numbers, and always required Barnhisel to ask Plaintiff to help employees in his pool.  Plaintiff stated that Barnhisel discriminated against him.  As a result of this, Cooper management talked to Barnhisel about telling employees to shut up, the importance of enforcing rules consistently with all employees, and gave Barnhisel a copy of the harassment policy which was discussed.  In his defense, Barnhisel stated that he also addressed white employee Mackey regarding extended time on breaks and told Mackey to get back to work.  (*Id.* at 29.).

On October 2, 2006, Plaintiff received an attendance notification signed by HR specialist Carol Espen claiming that he had reached an attendance level of .5.  (Doc. 47 at Ex. D pp. 19.).  Plaintiff thought that the .5 level was erroneous and met with Espen.  Plaintiff repeatedly told Espen "I hope you sleep well at night."  (Espen Dep, at 12-14.).  Espen felt threatened or harassed by Plaintiff.  (*Id.* at 16.).  Espen told Plaintiff that she would look into his attendance level.  (*Id.* at 18.).  The following day, October 3, 2006, Jodi Rosendale made a charge of harassment against

Plaintiff and met with Plaintiff "to discuss the harassment policy . . . and the comments he made [to] Carol Espen." (Doc. 38 at Ex. 3.).

### 2. January 23, 2007 charge of discrimination

Plaintiff's second charge of discrimination stated: "On the date of 1-19-07 Brock Tong call[ed] me a []Nigger[] with my supervisor standing right there[.] [Supervisor] Chuck Hawken did nothing to [h]im[.]  I can not work with that person.  I complained to [the] plant manager."

Tong claims to have used this racial slur after Plaintiff called Tong a "fucking weasel" several times.  (Tong Dep. at 15-16.).  After this incident, supervisor Chuck Hawkins separated Tong and Plaintiff and asked Tong to wait in the office.  (*Id.* at 17.).  Jodie Rosedale sent Tong home and disciplined him with one attendance point.  (*Id.* at 18.).  The following day, Rosendale required Tong to watch the "diversity in the work place video," had a question and answer session about the video, gave Tong a copy of the *Sexual and other Harassment Policy*, and spoke with Tong to ensure he understood why he was wrong.  (*Id.* at 18.).  Tong repeatedly apologized to Plaintiff.  (*Id.* at 19.).

On January 31, 2007, a disciplinary charge was filed against Plaintiff and Cooper met with a Union representative and Plaintiff "[t]o remind Mr. Butler of his indirect labor responsibilities to include the washing of gloves which is assigned to his pool and the weighing of baskets." (Doc. 38 at Ex. 3.).

On March 26, 2007, Espen signed another one point attendance notification because Plaintiff was absent "without report" on March 23, 2007.  (Doc. 47 at Ex. D pp. 15.).  Although Plaintiff claimed to have submitted a doctor's note on March 20, 2007, after several levels of the grievance process, Plant Manager Dewey Maynard concluded that "[d]ocuments and other

evidence provided demonstrate a consistent application of the doctor's excuse rule . . . [because] employees are required to bring in supporting documentation that confirms follow-up appointments, testing, and physical therapy." (Doc. 47 at Ex. B pp. 39.).  The only documentation provided by Plaintiff was the receipt for a "full body massage." (Doc. 52 at Ex. 16.).

### 3. November 20, 2007 charge of discrimination

Plaintiff's third charge of discrimination stated: "I began working for [Cooper] on 6/19/96 as a Mandrel Puller.  On 9/17/07, I was terminated for calling a co-worker a 'crybaby.'  However, a white co-worker who called me a 'N—r' received no discipline.  I am black.  I believe I have been discharged because of my race, black, in violation of the Civil Rights Act of 1964, as amended."

While the "N—r" comment concerned the incident discussed above with Plaintiff and Tong, this charge of discrimination primarily relates to two incidents between Plaintiff and his co-workers that ultimately led to Plaintiff's termination.

With regard to the first incident on August 21, 2007, Plaintiff was assigned to work in a pool with Troy Uzelac.  (Butler Dep. at 106; Uzelac Dep. at 8.).  Plaintiff and Uzelac had an argument over the number of "loads," or series of parts, they were going to "fire."  (Butler Dep. at 106.).  Cooper requires a "minimum [of] 18 loads processed per shift," but encourages employees to do more if they can.  (Doc. 38 at Ex. 1; Butler Dep. at 35.).  According to Uzelac, the pair were one load short of the 18 load minimum and had time for one more load.  (Uzelac Dep. at 11.).  Plaintiff first refused, but then helped fire the last load.  (Butler Dep. at 106.).  The following day, August 22, 2007, Plaintiff and Uzelac worked in a pool again.  Uzelac claims that Plaintiff only wanted to do 18 loads, but that Uzelac wanted to do more if time permitted. (Uzelac Dep. at 12.).

8

Uzelac claims that Plaintiff burned him by pushing hot mandrel bars into his side of the pool, which was discourteous in their line of work. (Uzelac Dep. at 15-16.).  Uzelac told his supervisor that he did not want to work with Butler because it was unsafe.  (Uzelac Dep. at 14.).  Butler claims that he mistakenly burnt Uzelac and that Butler corrected the problem and apologized. (Butler Dep. at 107.).  Uzelac stated that although Butler apologized, Butler continued to burn him.  (Uzelac Dep. at 14.).  Later that day, Uzelac remembers being burnt again from walking into a bar and subsequently warning Plaintiff that Uzelac would "jack slap" Plaintiff if Plaintiff would not stop burning him.  (*Id*. at 15.).  Uzleac reported Butler to supervisor Richard Meeks.  (*Id.* at 16.).  Meeks discussed the incidents with Plaintiff and Uzleac and took notes. (Doc. 47 at Ex. B pp. 35-37.).  The notes stated that, on the first day, Butler was in the cafeteria instead of working his shift and that Meeks had to instruct Butler to go back to his work station.  Later that day, Uzelac complained again about Butler for slowing down the work.  (*Id.*).  The following day, Butler again wanted to shoot less loads than Uzelac and Uzelac threatened Butler.  (*Id.*).  Meeks asked Butler to do his best each day and to do as many loads as possible to improve the plant's productivity.  (*Id.*).   Cooper then scheduled for Plaintiff and Uzelac to meet with plant manager Dewey Maynard "to discuss each employees necessity to modify their behavior if they wish to maintain employment."  (*Id.*).

Maynard had conversations with Uzelac and Butler individually and concluded that both employees engaged in unacceptable behavior.  Maynard concluded that Uzelac should not have "threatened [Butler]," and Butler should not have prevented Uzelac from doing his work.  (Doc. 38 at Ex. 7.).  Butler acknowledges that after these incidents the company informed him to be

9

productive, and never try to intentionally slow down work or intentionally do less work.  (Butler Dep. at 129.).

Turning to the second incident on September 6, 2007, Michael St. Clair, John Brose, and Butler were running three pools.  (Butler Dep. at 131.).  According to Butler's co-worker, Butler blocked the autoclave control panel so that Brose could not fire a load.  (Tim Rhamy Aff. at ¶ 4.). The following day, Brose complained to supervisor Rodney Mahler and said that Butler had prevented him from firing a load by hitting the Emergency Stop ("E-Stop") button.  When Mahler came to the pool to discuss the situation with Plaintiff and St. Clair, Mahler claims to have asked Plaintiff why he hit the E-Stop button.  (Rodney Mahler Aff. at ¶ 4.).  Mahler claims that Plaintiff's response was that he and St. Clair did not want to fire as many loads as Brose.  (Rodney Mahler at ¶ 5.).  When Mahler tried to talk to Plaintiff about this, Plaintiff called Brose a "crybaby."  (*Id.*; Butler Dep. at 197.).

Plaintiff received a Corrective Action Notice for hitting the E-Stop button.  (Doc. 38 at Ex. 10.).  Carol Epsen and the Union conducted an investigation of the incident.  (*See* Doc. 38 at Ex. 11; Carol Espen Aff.).  Epsen took extensive notes detailing the meetings Epsen had with the individuals involved in the incident.  (*See* Doc. 38 at Ex. 11.).  After the investigation, Cooper fired Plaintiff for intentionally preventing Brose from doing his job.  (Doc. 38 at Ex. 12.).  *The result of the Union's investigation was that Cooper had just cause under the collective bargaining agreement to terminate Plaintiff.*  (*See* Doc. 38 at Ex. 13; Kevin West Aff.).

Plaintiff has filed this suit against Barnhisel and Cooper for: (1) race discrimination under state and federal law; (2) hostile work environment racial harassment under state and federal law; and (3) retaliation under state law.

## II. Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

11

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071.  The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## III. Discussion

In Defendants Cooper and Barnhisel's motion to dismiss, Defendants argue that this Court lacks subject matter jurisdiction because Plaintiff failed to file a charge of discrimination with the EEOC.  Because filing a charge is a condition precedent to bringing a Title VII action, the Court shall address this motion before discussing Plaintiff's employment discrimination claims.

In Defendant Cooper's motion for summary judgment with regard to Plaintiff's race discrimination and retaliation claims, Cooper argues that Plaintiff cannot establish a *prima facie* case of discrimination or retaliation, and that Cooper has articulated a legitimate non-discriminatory reason for terminating Plaintiff that is not a pretext for discrimination.  As to

12

Plaintiff's hostile work environment claim, Cooper argues that Plaintiff was not subject to a hostile work environment on the basis of his race.  In Barnhisel's motion for summary judgment, Barnhisel argues that he cannot be held liable as an individual.

In Butler's response to Defendants' motions for summary judgment, he argues that Cooper has a record for mistreating black employees and that he was a victim of supervisor Barnhisel's racism.  Plaintiff believes that when he began to voice his objections, Cooper retaliated by imposing harsh sanctions and eventually terminated Butler because of his race.

### A. Administrative exhaustion

As a preliminary matter, the Court shall address Defendants Cooper and Barnhisel's motion to dismiss Plaintiff's Title VII race discrimination and retaliation claims for failure to exhaust administrative remedies.  (Doc. 32.).  Defendants argue that this Court lacks subject matter jurisdiction because Plaintiff failed to file a charge of discrimination with the EEOC with regard to Plaintiff's federal retaliatory discharge and race discrimination claims.

Plaintiff's response explains, first, that Plaintiff's retaliation claims are based solely on Ohio law.  Second, Plaintiff did in fact file charges of discrimination with respect to Plaintiff's Title VII racial discrimination claims on August 29, 2006, January 23, 2007, and November 20, 2007.  Furthermore, in September 2007, the EEOC issued right-to-sue letters to Plaintiff.

Unlike Defendant's statement of the law, timely filing with the EEOC and obtaining a right-to-sue letter are conditions precedent, rather than jurisdictional requirements, to bringing a Title VII action.  *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 400-401 (6th Cir. 2008) ("[Defendant's] assertion that the exhaustion requirement is a jurisdictional prerequisite is no

13

longer accurate in light of the Supreme Court's decision in *Arbaugh v. Y & H Corp.*, 546 U.S. 500,

126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006)").

The question before this Court is whether Plaintiff failed to exhaust his administrative

remedies prior to filing his federal claims. In order to exhaust administrative remedies before

filing suit for illegal employment discrimination under Title VII of the Civil Rights Act of 1964,

42 U.S.C. §§ 2000e et seq., a plaintiff must first timely file a charge with the EEOC. *Amini v.*

*Oberlin College*, 259 F.3d 493, 498 (6th Cir. 2001); *Cox v. City of Memphis*, 230 F.3d 199,

201-02 (6th Cir. 2000). Title VII imposes a dual statute of limitation:

> Usually, if the alleged discrimination occurred more than 180 days prior to the
> plaintiffs' filing of an EEOC charge, claims implicating these actions are barred.
> However, if the alleged unlawful practice occurs in a 'deferral state,' in this case
> Ohio, which has enacted its own laws prohibiting discrimination in employment,
> the plaintiff must file suit within 300 days of the alleged discriminatory act.

*Amini*, 259 F.3d at 498. The 300 day time period begins to run when the plaintiff learns of the

discriminatory act, not when the act's consequences are felt. *Leffman v. Sprint Corp.*, 481 F.3d

428, 432 (6th Cir. 2007). After receipt of a right-to-sue letter from the EEOC, the plaintiff has 90

days in which to bring his claim in federal district court. 42 U.S.C. § 2000e-5(f)(1).

Here, Plaintiff has presented to the Court the charges of discrimination that Plaintiff sent to

the EEOC. (*See* Doc. 34 at Ex. A-C.). In the August 29, 2006 charge, Plaintiff complained that

"[t]he supervisor harass[es] me ever[y] chance he gets[.] [O]n Aug 26[, 2006,] he got into my face

and told me to shut the F... up and [h]e said he would find [a reason] to send me home. First shift

supervisor Tim [Barnhisel also did this] to other person[s] of my race." (Doc. 34 at Ex. C.). In the

January 23, 2007 charge, Plaintiff complained about allegedly illegal discrimination that occurred

on January 19, 2007: "On the date of 1-19-07 Brock Tong call[ed] me a []Nigger[] with my

14

supervisor standing right there[.] [Supervisor] Chuck Hawken did nothing to [h]im[.]  I can not work with that person.  I complained to plant manager."  (Doc. 34 at Ex. B.).  EEOC mailed two right-to-sue letters to Plaintiff on September 27, 2007.  (Doc. 34 at Ex. A-B.).  Eighty-four days later, on December 20, 2007, Plaintiff filed this lawsuit in state court.[2]  Thus, the alleged discrimination occurred less than 180 days before Plaintiff filed the EEOC charges, and Plaintiff filed this suit within 90 days of receiving right-to-sue letters.  As a result, Defendant's motion to dismiss is denied.

### B. Race Discrimination

It is unlawful under federal law for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) .  Federal and state employment discrimination claims are analyzed under similar standards so that a plaintiff's failure to meet the requirements of one cause of action generally precludes the plaintiff from prevailing in another.  *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020 n.2 (6th Cir. 2000) (standards for Title VII are equally applicable to claims under Ohio Rev. Code § 4112); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128, 131 (1981) (evidence sufficient to support a finding of discrimination under Title

---

[2]

 Plaintiff filed a third charge on November 20, 2007 for an alleged illegal discriminatory action taken on September 17, 2007: "I was terminated for calling a co-worker a 'crybaby.'  However, a white co-worker who called me a 'N...r' received not discipline.  I am black.  I believe I have been discharged because of my race. . ."  Doc. 34 at Ex. A.  The EEOC issued a right-to-sue letter on September 11, 2008.  *Id.*  The issuance of such a letter after the commencement of suit under Title VII cures the jurisdictional defect in the original complaint.  *Berg v. Richmond Unified School Dist.*, 528 F.2d 1208, 1212 (9th Cir. 1975) (*citing Henderson v. Eastern Freight Ways, Inc*., 460 F.2d 258, 260 (4th Cir. 1972), cert. denied, 410 U.S. 912, 93 S.Ct. 976, 35 L.Ed.2d 275 (1973)); *Jones v. United Gas Improvement Corporation*, 383 F.Supp. 420, 424 (E.D.Pa. 1974).

15

VII is necessary before a violation of § 4112.02(A) can be shown); *see e.g. Tysinger v. Police Dep't. of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).

A plaintiff may prove illegal discrimination by presenting: (1) direct evidence of intentional discrimination by the defendant, *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004); (2) circumstantial evidence which creates an inference of discrimination, *Gibson v. City of Louisville*, 336 F.3d 511, 513-14 (6th Cir. 2003); or (3) either direct or circumstantial evidence that the plaintiff's protected characterization played a motivating part in an adverse employment action, *White v. Baxter Healthcare Corp*. 533 F.3d 381, 406 (6th Cir. 2008).  Here, Plaintiff argues each of these theories of race discrimination.

### 1. Direct evidence of intentional discrimination

Direct evidence is evidence that proves that discrimination has occurred without requiring further inferences. *Reeves v. Swift Trans. Co.*, 446 F.3d 637, 640 (6th Cir. 2006).  The decision-maker must have "relied-upon" the discriminatory reason in making the decision.  *Todd v. City of Cincinnati*, 436 F.3d 635, 637 (6th Cir. 2006).  But, "relied-upon" does not mean that the discriminatory motivation was the "sole reason."  *Id.* at 638.  "[T]he evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [race], but also that the employer acted on that predisposition." *Hein v. All America Plywood Co.*, 232 F.3d 482, 488 (6th Cir.2000).  In direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove by a preponderance of the evidence that it would have terminated the employee even had it not been motivated by impermissible discrimination.

16

*DiCarlo,* 358 F.3d at 415; *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994).

Here, Butler has failed to proffer direct evidence of illegal discrimination.  The only time Plaintiff claims that a racial slur was used to refer to him was when Tong, a co-worker, called Plaintiff a "lazy nigger" in response to when Plaintiff called Tong a "fucking weasel."  In response to Tong's racial slur, Cooper suspended Tong for the remainder of the work day, provided him a one-on-one harassment training with the HR Manager, and was reminded of the company's policy against harassment in the work place.  *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (discriminatory remark made by someone without managerial authority does not indicate discrimination).  Examples of direct evidence include racial slurs made by a manager, a school principle's statement that a "white presence" should be maintained in the school, and evidence that a restaurant owner made racist remarks about blacks.  *Talley v. Bravo Pitino Rest.*, 61 F.3d 1241, 1248-49 (6th Cir. 1995).  Unlike these examples, the evidence the Plaintiff puts forth requires the Court to infer that Plaintiff faced illegal discrimination.

### 2. Circumstantial evidence that creates an inference of discrimination

Where no direct evidence of discrimination exists, the familiar *McDonnell Douglas* framework applies.  An employee must first establish his/her *prima facie* case by indirect or circumstantial evidence.  In that instance, he must show (1) that he is a member of the protected class; (2) that he was denied opportunities or experienced an adverse employment decision; (3) that he was otherwise qualified; and (4) that other individuals outside the protected class received more favorable treatment. *See Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 53 (6th Cir. 1990); *Gagné v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 313 (6th Cir. 1989).

Here, Defendants do not dispute that Plaintiff satisfies the first three elements: (1) Plaintiff is black; (2) Plaintiff was terminated; and (3) Plaintiff was otherwise qualified.  The parties are in dispute with regard to whether Plaintiff has satisfied the fourth element. Both parties make compelling arguments.

Defendants argue that Cooper did not treat Plaintiff differently from non-black individuals. Specifically, Cooper argues that Plaintiff cannot name a white employee who (1) was warned about intentionally slowing down or interfering with the performance of his co-workers; (2) ignored this warning; and (3) was not fired.  Defendant argues that the other employees who also misbehaved, such as Uzelac, Brose, St. Clair, and others, heeded Cooper's warning whereas Plaintiff did not.  On the other hand, Plaintiff argues that he was treated differently from white employees in several situations.  For example, in June 2006, Barnhisel disciplined Butler for failing to properly insert his ear plugs.  Plaintiff argues that Barnhisel overlooked white employees, such as Tong, when they failed to do the same.  Brock Tong told Brownlee that Barnhisel ignores Tong's persistent failure to properly wear hearing protection.  (Brownlee Dep. at 6, 72, 10.).  Plaintiff also argues that he was singled out because of "Jimmie jobs," which, according to his deposition, are "out of the ordinary" duties that Barnhisel would ask Butler to do during the overtime shift, such as work until the end of the shift when others would finish the shift early.[3]  (Butler Dep. at 80-84.).  Because Plaintiff ultimately fails to prove that Cooper's nondiscriminatory reason for terminating Plaintiff was a pretext for discrimination, the Court shall assume without deciding that Plaintiff has satisfied the requisite elements of a *prima facie* case.

---

[3]  Tong, who coined the phrase, explains "Jimmie jobs" to be "jobs we had to do because Jimmie wouldn't do them.  Like you know, there was little things that needed to be done."  (Tong Dep. at 30.).

18

Having set forth a *prima facie* case, a presumption arises that the employer unlawfully discriminated against the plaintiff.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  The burden of production now "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the less favorable treatment.  *See McDonnell Douglas*, 411 U.S. 792, 802 (1973).  Here, Cooper has provided a legitimate, nondiscriminatory reason for why the company terminated Plaintiff.  Cooper's stated reason for terminating Butler is that Butler intentionally prevented his co-workers from firing loads despite prior warning that such conduct could cause Cooper to terminate Plaintiff.  (Doc. 47 at Ex. A. pp. 45.).

Where the defendant establishes that the actions were taken for a legitimate, nondiscriminatory reason, it becomes the plaintiff's burden to prove by a preponderance of the evidence that the reason was actually a pretext for discrimination.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-47 (2000) ("the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff.. . . [I]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination. . . .").  To establish pretext, a plaintiff may meet his or her burden by showing that the adverse employment action: (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action.  *Manzer*, 29 F.3d at 1084; *Cicero v. Borg-Warner Automotive, Inc*., 280 F.3d 579, 589 (6th Cir. 2002).

Here, Plaintiff argues that the discrimination he faced is a part of Cooper and Barnhisel's history of mistreating black employees.  However, the full stories of the individuals who Plaintiff

19

claims were mistreated on account of their race do not conclusively support Plaintiff's argument. With regard to Brownlee, Barnhisel admonished Brownlee in 1999 before Barnhisel was a supervisor, Brownlee admitted that he was in violation of the company rules when he was admonished, and there was no evidence presented that Barnhisel failed to admonish a white employee who Barnhisel knew was violating the same rule. (Brownlee Dep. at 8-15, 47-48.). With regard to Walker, while Barnhisel was not without reason for admonishing Walker for violating the company's safety rules, Barnhisel's threat to Brownlee that he would do to Brownlee "like we did to Roy [Williams]" gives reason for pause. (Walker Dep. at 12-14; Brownlee Dep. at 21.). Although Cooper has submitted evidence that Cooper complied with its internal "attendance" policy before terminating Williams, the fact that Barnhisel's threat was prefaced with Barnhisel's comment that employees should not "play the race card" could create an inference that Barnhisel would attempt to terminate Brownlee on account of race. However, there are two important considerations here. First, Barnhisel's threat was directed towards Brownlee, and not Plaintiff, who was not involved at all in this altercation. *See Schrand v. Federal Pacific Electric Co.,* 851 F.2d 152, 156-57 (6th Cir.1988); *Calderwood v. OmniSource Corp.*, 2007 WL 2838969 (N.D. Ohio Sept. 26, 2007) ("me, too" evidence is generally unwelcome in this Circuit). Second, there is no evidence that Barnhisel actually attempted to take any adverse action against Brownlee as a result of this incident. With regard to "Jimmie jobs," such work was not limited to Butler. (Butler Dep. at 87.). Plaintiff admitted that Barnhisel did not assign him jobs outside of his duties and that there was always a white employee to whom Barnhisel would assign the same task. (Butler Dep. at 79-80, 203.).

20

There is no dispute that Cooper and Union investigated Plaintiff's dispute with Uzelac and Brose. (Doc. 38 at Ex. 7-13.). With regard to the incident with Uzelac, Plant Manager Dewey Maynard spoke with Uzelac and Butler individually and stated that both employees engaged in unacceptable behavior. Uzelac should not have "threatened [Jimmie]" and that Butler should not have prevented Uzelac from doing his work. (Doc. 38 at Ex. 7.). Butler acknowledges that after these incidents the company informed him to be productive, and never try to intentionally slow down work or intentionally do less work. (Butler Dep. at 129.).

With regard to the incident with Brose, Plaintiff called Brose a "crybaby" after Plaintiff allegedly pressed the E-Stop button. The Court notes that Plaintiff has not consistently admitted to pressing the E-Stop button. In the Corrective Action Notice, Plaintiff did not dispute that he hit the E-Stop button (*Id.*). In Plaintiff's opposition to Defendants' motions for summary judgment, Plaintiff's attorney admits that he hit the E-Stop button. (Doc. 47 at 37.). Yet in his affidavit, Plaintiff claims that he did not hit the E-Stop button. (Bulter Aff. at ¶ 8.). However, in Plaintiff's supplemental memorandum in opposition to Defendants' motions, Plaintiff's attorney again argues that "all the Plaintiff did was press one button, one time." (Doc. 58 at 6.).

The Court is cognizant that under the standard for summary judgment, Plaintiff may have created a genuine question of material fact as to whether Plaintiff actually pressed the E-Stop button. However, the relevant question here is not whether Plaintiff pressed the button, but rather whether Defendant "honestly believed" that Plaintiff pressed the E-Stop button. *See Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) ("[P]laintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its

adverse employment action").  Carol Epsen from Cooper's HR Department conducted an

investigation of the Brose incident.  (*See* Doc. 38 at Ex. 11; Carol Espen Aff.).  Epsen took

extensive notes detailing the meetings she had with all of the individuals involved in the incident.

(Doc. 38 at Ex. 11.).  Espen concluded, based on witnesses whose testimony regarding the

incident was consistent with their depositions in connection with this litigation, that Plaintiff hit

the E-Stop button.  Even Plaintiff's attorney, on at least two occasions, stated that Plaintiff hit the

E-Stop button.  (Doc. 47 at 37; Doc. 58 at 6).  Cooper fired Plaintiff for intentionally preventing

Brose from doing his job, the very conduct Plaintiff was warned against after the incident with

Uzelac.  (Doc. 38 at Ex. 12.).  The Union conducted a separate investigation that concluded that

Cooper had just cause under the collective bargaining agreement to terminate Plaintiff.  (*See* Doc.

38 at Ex. 13; Kevin West Aff.).  Grievance Committee Chairman Kevin West states that:

> "after . . . [the incident with Uzelac,] Butler was warned that any further incidents
> involving his preventing or interfering with other employees performing their jobs
> could result in his termination . . . [T]he Grievance Committee found that the light
> indicating that the emergency stop button had been pushed was on . . . I was
> present when the company interviewed Jimmy Butler.  Butler initially admitted that
> he had pushed the button but later changed his story and denied it."

(Kevin West Aff. at ¶ 5-7.).  The evidence clearly establishes that Defendant "honestly believed"

that Plaintiff pressed the E-Stop button and intentionally prevented a co-worker from doing his

job.  Plaintiff has failed to show that Defendant's nondiscriminatory reason for terminating

Plaintiff was a pretext for discrimination.

### 3. Direct or circumstantial evidence of mixed motive discrimination

The Supreme Court has recognized a mixed-motive claim in Title VII actions where "a

plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a

preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating

factor for any employment practice.'"  *Desert Palace v. Costa*, 539 U.S. 90, 101-02 (2003); *see also White*, 533 F.3d at 406 (6th Cir. 2008).  It is not necessary to present direct evidence to establish a mixed-motive claim; circumstantial evidence is sufficient.  *Id.*  Like direct-evidence claims, in a mixed-motive claim, the *McDonnell Douglas* burden-shifting framework does not apply.  *White*, 533 F.3d at 401-02 (6th Cir. 2008).  A mixed-motive discrimination claim survives summary judgment if "there are any genuine issues of material fact concerning [Cooper's] motivation for its adverse employment decision."  *Id.*  at 402.  This burden "is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonable be construed to support [Butler's] claim."  *Id.* at 400.

Here, while it is a closer question, Butler's mixed motive claim does not survive this relatively low burden.  The fact that Butler did not fail in establishing a *prima facie* case under the *McDonnell Douglas* burden shifting analysis can be considered in favor of his mixed motive claim.  *White* 533 F.3d at 401.  However, almost all of the evidence that Butler brings to prove race discrimination against Butler is more accurately described as either evidence that Defendants discriminated against someone other than Plaintiff, or evidence to show that Butler did not violate Cooper's policies.  *See Graham v. Best Buy Stores, L.P.* 2008 WL 4679547 at * (6th Cir. October 22, 2008).  Plaintiff's two primary arguments are that: (1) Plaintiff was not at fault for slowing down the work of Uzelac or Brose, and (2) Brownlee, Walker, and Williams were mistreated by Defendants.

While Plaintiff also claims that he was called "nigger" by a co-worker, a "discriminatory remark made by someone without managerial authority does not indicate discrimination."  *Smith*, 220 F.3d at 759.  Furthermore, Cooper responded by punishing Tong for making the comment and

23

Cooper had a question and answer session with Tong about harassment.  With regard to "Jimmie jobs," Plaintiff admitted that Barnhisel did not assign him jobs outside of his duties and that there was always a white employee to whom Barnhisel would assign the same task.  (Butler Dep. at 79-80, 203.).

For the foregoing reasons, Cooper's motion for summary judgment on Plaintiff's race discrimination claims is hereby granted.

### C. Hostile Work Environment

Title VII prohibits an employer from maintaining a hostile work environment due to racial, sexual, or religious harassment.  *Hafford v. Seidner*, 183 F.3d 532 506, 512 (6th Cir. 1999) (amended opinion). The elements of a *prima facie* case of a racially hostile work environment are: (1) plaintiff is a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with the plaintiff's work performance; and (5) the employer knew or should have known about the harassing conduct but failed to take corrective action.  *Bailey v. USF Holland, Inc*., 526 F.3d 880, 885 (6th Cir. 2008); *Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 484 (6th Cir. 1990).

"A hostile work environment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Bowman v. Shawnee State University*, 220 F.3d 456, 463 (6th Cir. 2000) (citations omitted).  In order to find a hostile work environment, "[b]oth an objective and a subjective test must be met: the conduct

must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Id.*

Butler seeks to hold Cooper liable for harassment by both co-workers and supervisors.  An employer is liable for harassment by co-workers if it "knew or should have known of the charged [race] harassment and failed to implement prompt and appropriate corrective action." *Hafford*, 183 F.3d at 513. "In contrast, employer liability for supervisor harassment is vicarious." *Id.*  An employer may raise an affirmative defense that: (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the employee failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999).

Here, Plaintiff was subject to one racial slur by Tong during his employment at Cooper.  In response, and as stated above, Cooper suspended Tong for the remainder of the work day and provided him with a one-on-one harassment training with the HR Manager.  Plaintiff admits that, after this incident, nobody at Cooper ever made a derogatory comment to Plaintiff again.  (Butler Dep. at 159.).  There is no legal standard which requires any workplace to be warm and welcoming; however, the absence thereof is not tantamount to a hostile work environment. As noted recently by the Sixth Circuit, "occasional comments, which may have been 'offensive utterances,' do not rise to the level required by the Supreme Court's definition of a hostile work environment ... [t]o hold otherwise would risk changing Title VII into a 'code of workplace civility,' a result we have previously rejected." *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008) (citations omitted).  Cooper's motion for summary judgment on Plaintiff's hostile work environment claim is hereby granted.

**D. Retaliation**

To establish a *prima facie* case of retaliation, a plaintiff must show by a preponderance of the evidence that: (1) he engaged in an activity protected by Title VII; (2) the activity was known to the defendant; (3) he was subjected to an adverse employment action; and (4) the adverse action occurred because of the protected activity. *McClain v. NorthWest Cmty. Corr. Ctr.*, 440 F.3d 320, 335 (6th Cir. 2006). If a plaintiff can show temporal proximity between his engagement in a protected activity and an adverse employment action, he meets his burden of establishing a causal connection at the *prima facie* stage. *See, e.g., Mickey v. Seidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (finding that three months between plaintiff's request for leave and termination satisfies the *prima facie* case of retaliation). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *See Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003).

Here, Plaintiff has established a *prima facie* case. Plaintiff has met the first, second, and third elements because: (1) filing discrimination complaints is a protected activity; (2) Cooper was aware of Butler's protected activity; and (3) Butler suffered an adverse employment action: he was terminated. *See e.g. Parnell v. West*, 114 F.3d 1188 (6th Cir. 1997). With regard to the fourth element, Plaintiff claims the following acts of retaliation: (1) Dewulf's investigation that ignored Barnhisel's threat to suspend Plaintiff surfaced shortly after Cooper received notice that Butler filed the August 29, 2006 charge of discrimination with the EEOC, (Doc. 47 at Ex. B pp. 28-29.); (2) Carol Espen signed an attendance notification that Butler reached a .5 attendance level fourteen days after Cooper learned about Plaintiff's August 29, 2006 charge of discrimination with the EEOC, (*Id.* at Ex. D pp. 19.); (3) Cooper signed a disciplinary charge against Plaintiff eight

26

days after Plaintiff filed the January 23, 2007 charge of discrimination against Cooper "reminding him of his indirect labor responsibilities," (*Id.* at Ex. D pp. 9.); (4) Cooper charged Butler with leaving his station early sixteen days after Cooper filed a February 21, 2007 position statement with the EEOC, (*Id.* at Ex. D pp. 13.); (5) Carol Espen singed a one point attendance notification for Butler's failure to appear to work two months after Plaintiff filed the January 23, 2007 charge of discrimination, (*Id.* at Ex. D pp. 12, 15.); (6) Cooper summoned Plaintiff to discuss Plaintiff's conduct towards hourly employees on May 31, 2007, six days after Cooper sent a letter of acknowledgment in response to Plaintiff's attorney's letter of representation, (*Id.* at Ex. P; *Id.* at Ex. D pp. 8); and (7) Cooper terminated Plaintiff after the incidents with Uzelac and Brose. Plaintiff has sufficiently established that Cooper took adverse actions within a relatively short temporal proximity after the protected activity.  Thus, Butler has established a *prima facie* case.

As a result, the burden shifts to Cooper to state a legitimate, nondiscriminatory reason for its adverse employment action.  *See Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997).  Cooper "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257, 101 S.Ct. 1089.  As stated above, Cooper has stated the following legitimate, nondiscriminatory reason: Butler intentionally prevented his co-workers from firing loads despite prior warning that such conduct could cause Cooper to terminate Plaintiff.  (Doc. 47 at Ex. A pp. 45.).

Plaintiff bears the ultimate burden of proving that the employer's proffered reason for the action was merely a pretext for discrimination.  *Penny,* 128 F.3d at 417.  "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not

27

actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews*, 231 F.3d at 1021.

Guidance from the Sixth Circuit supports Defendants' argument that Cooper's reasons for taking adverse actions against Plaintiff were not pretexts for discrimination.  A charge of discrimination does not shield an employee from an employer's legitimate disciplinary action. *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1312 (6th Cir. 1989) ("[T]he fact an employee files a complaint or charge does not create any right on the part of the employee to miss work, fail to perform assigned work, or leave work without notice").  Furthermore, "the mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim."   *Booker*, 879 F.2d at 1314; *see Jefferies v. Harris County Community Action Assoc.*, 615 F.2d 1025, 1036 (5th Cir.1980) (even where an employer wrongly believes an employee has violated Company policy, it does not discriminate in violation of Title VII).

Here, each of the disciplinary actions that Cooper took was because of Cooper's belief, based on undisputed facts, that Plaintiff violated a company rule.  Plaintiff has not established that Cooper's reasons for taking adverse actions had no basis in fact, did not actually motivate Cooper's conduct, or was insufficient to warrant the challenged conduct. With regard to Dewulf's investigation, Plaintiff admitted that he was improperly wearing earplugs when Barnhisel approached him.  (Butler Dep. at 53). With regard to Espen's attendance notification, Plaintiff has not established that Espen's calculation of Plaintiff's attendance level was at fault.  Moreover, Cooper was not retaliating against Plaintiff when the company followed-up on Butlers repeated remarks hoping that Espen "sleeps well at night."  With regard to the disciplinary charge against

28

Plaintiff "reminding him of his indirect labor responsibilities" and leaving his work station early, Plaintiff was not disciplined for either incident and he admitted that he left his station early. (Butler Dep. at 99-100.).  With regard to the attendance notification for Butler's failure to appear to work, Cooper cannot be said to have retaliated because the documentation Plaintiff supplied to support his absence was a receipt for a "full body massage." (Doc. 52 at Ex. 16.).  With regard to Cooper's meeting with Plaintiff to discuss Plaintiff's conduct towards hourly employees, Plaintiff cannot remember what this incident was about.  (Butler Dep. at 101.).  Plaintiff has not established that this discussion was something more than a justified discussion about Plaintiff's work performance.  The Court has repeatedly discussed the incidents between Plaintiff and Uzelac, and between Plaintiff and Brose.  It is sufficient to conclude that, in light of the evidence before the Court, Butler's own admissions, and Cooper's internal investigations indicating that Plaintiff twice interfered with the work of other employees, Plaintiff has not shown that his discharge was retaliatory in nature.  For the foregoing reasons, Cooper's motion for summary judgment on Plaintiff's retaliation claims is hereby granted.

### E. Individual Liability

Butler alleges individual liability against supervisor Barnhisel.  "[A] supervisor who does not otherwise qualify as an employer cannot be held personally or individually liable under Title VII." *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 362 (6th Cir. 2001).  The Sixth Circuit, however, has left open the possibility that "a supervisor may be held liable in his or her official capacity upon a showing that he or she could be considered the 'alter ego' of the employer." *Id.* at 362 n.2.

29

Most of the actions in question were taken by Barnhisel as Butler's supervisor at Cooper. Plaintiff's claims against Barnhisel are generally parallel to the claims against Cooper discussed above. The Court is therefore compelled to grant summary judgment on these claims on the same bases and for the same reasons as the claims against Cooper. Furthermore, Plaintiff has failed to establish that Barnhisel had significant control over Plaintiff's hiring, firing and working conditions such that he could be considered the "alter ego" of Cooper. *See e.g., Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993).

## IV. Conclusion

For the reasons stated herein, Defendants Cooper and Barnhisel's motion to dismiss (Doc. 32) is hereby denied. Defendant Barnhisel's motion for summary judgment (Doc. 37) is hereby granted. Defendant Cooper's motion for summary judgment (Doc. 38) is hereby granted.

IT IS SO ORDERED.

    s/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE